[Civ. No. 11706.   First Dist., Div. One.   Jan. 6, 1942.]

T. P. BODKIN et al., Respondents, v. MARY E. SILVEIRA, as Administratrix, etc., et al., Appellants.

Sullivan, Roche & Johnson, Eustace Cullinan, Jr., and George H. Harlan for Appellants.

Brobeck, Phleger & Harrison and Moses Lasky for Respondents.

KNIGHT, J.—This suit in equity was instituted by certain stockholders of the Marin Dairymen's Milk Co., Ltd., to impress a trust on a block of the company's stock sold by F. P. Grady and wife to the defendants, and to compel the defendants to transfer to plaintiffs the proportion thereof to which plaintiffs claimed to be entitled. The cause of action is based mainly on allegations to the effect that the sale and purchase of the Grady stock was in violation of the terms of a voting trust agreement which granted to each party thereto the option to purchase his proportion of the stock of any party intending to sell. The parties to the agreement included the plaintiffs, the Gradys, several of the defendants, and two persons now deceased. At the time the agreement was entered into the parties thereto were the owners of all but 108 of the 4125 outstanding shares of stock in said company. The

principal defense interposed was that at the time of the sale and purchase of the Grady stock it was entirely free of and unencumbered by any restrictions of the voting trust agreement. The trial court found in favor of plaintiffs on all material issues and entered a decree accordingly, wherein it was decreed, among other things, that plaintiffs were the equitable owners of 207.22 shares of the Grady stock, which represented their proportion of the 463 shares sold by the Gradys to the defendants; and it was ordered that said proportion be transferred by defendants to plaintiffs after compliance with certain prerequisites set forth in the decree, including reimbursement to defendants. From said decree defendants appeal.

The respective parties filed most comprehensive briefs, and consideration has been given to the numerous points and extensive arguments made therein. However, there is little if any dispute as to the essential facts, and in the final analysis the determinative legal issues are comparatively few. The major question presented involves the soundness of the construction placed by the trial court upon the sixth clause of the voting trust agreement. The important facts of the case may be stated as follows: In May, 1933, or thereabouts, plaintiffs and defendants and Grady succeeded in gaining control of the corporation from another group, which appears to have been eliminated from the stock ownership. At that time and on May 6, 1933, plaintiffs, all of the defendants who then owned stock in the corporation, and Grady and his wife, entered into a written agreement denominated a "voting trust agreement." Thereby, in consideration of the mutual promises therein made, plaintiffs T. P. Bodkin and A. D. Corda, and the defendants E. B. McNear, R. Ghisletta, M. A. Nunes and A. F. Silveira, and said F. P. Grady, were constituted voting trustees; and the parties to said agreement agreed to transfer to said voting trustees all stock of the corporation then owned or thereafter to be acquired by them (save that each might retain 5 shares free of said voting trust), to be held by the voting trustees until March 1, 1938, and the voting trustees agreed to issue to each party to the agreement voting trust certificates evidencing his beneficial interest in the stock, legal title to which was to be held by the trustees. Furthermore, it was agreed that the voting trustees should possess all the rights of stockholders with respect to the stock so transferred to them, including the right to vote the stock; but that

the trustees should pay to the respective parties all dividends which the trustees might collect on the stock so transferred to them. It was further agreed that on March 1, 1938, the voting trustees would cause to be issued to the party owning or entitled to each voting trust certificate fully paid-up shares of the capital stock of the corporation in the amount represented by the voting trust certificate; that the voting trust certificates should be transferable only on books to be kept by the voting trustees, and that no such certificate should be valid unless signed by the voting trustees and counter-signed by the registrar; that the voting trust certificates should be in a specified form, and might be sold and transferred only subject to the terms of the voting trust agreement, of which fact each voting trust certificate gave express notice on its face. The agreement then provides: "Sixth: Each of the parties hereto for himself hereby agrees that he will not assign or sell his voting trust certificate or any of the same, or any interest in the shares of stock represented thereby, nor divest himself of any interest therein during the term hereinbefore specified, or any extension thereof, as hereinafter provided, unless and until he shall first notify the parties hereto in writing of his intention to sell said certificates, stating the price, terms and conditions upon which he desires or intends to sell said certificates, and the parties hereto may then exercise their right to purchase said certificates in proportion to their holding in preference to any person, firm or corporation making any such offer to purchase said certificates; Provided, However, that in the event any of the parties to this agreement shall not exercise their option to purchase the proportion of said Voting Trust certificates which he may be entitled to so purchase, the other parties to the agreement shall have the first right and option to purchase said certificates in the proportion that their certificates then owned bears to all voting trust certificates at that time issued and outstanding; and Provided, Further, that in the event Stockholders do not fully exercise said right and option within ten (10) days after receipt of said notice from the Stockholder desiring to sell his said certificates, said Stockholder desiring to sell his certificates, his heirs, executors or assigns, may hold such certificates as have not been acquired by Stockholders under said option subject to this agreement, or sell said certificates for such price as he may deem advisable to any person whatsoever." The rest of Clause Sixth is substantially the same as

the first proviso above quoted, except that it refers to ''stockholders'' rather than to ''the parties to this agreement.''

According to plaintiffs, the purpose of the sixth clause and of the voting trust was to maintain the same proportions of the ownership of stock as existed at the time the agreement was made; and defendants say that the purpose was to prevent hostile competing interests in the dairy industry from insinuating themselves into the corporation. Whatever may have been the purpose, all of the parties to the agreement, in conformity with its provisions, transferred all of their stock to the voting trustees (each party retaining five shares free and clear of the agreement), and received voting trust certificates therefor. Sometime after May 6, 1933, the stockholders fell into two groups, a minority group, consisting of plaintiffs and the Gradys, and the majority, consisting of the defendants who then held stock. (Some of the defendants have died and their representatives have been substituted; the other defendants who were not parties to the agreement are those to whom the Grady stock was also distributed.) At that time the total outstanding stock was 4125 shares. The plaintiffs—the minority group—owned 1191 shares of the stock, and the principal defendants—the majority group—owned 2358 shares. Grady and his wife were aligned with the minority group. They were the largest single stockholders, owning together 463 shares (plus the five they, like the other stockholders, retained free of the voting trust). According to plaintiffs, early in May, 1934, the differences between the majority and minority groups reached such a breaking point that the minority group, including the Gradys, agreed to act as a unit, and as such either to buy out the entire majority or sell their stock to the majority. In pursuance of this plan they consulted attorney Gregory Harrison, and informed him what they wished to do. In this regard the trial court found on sufficient evidence that the members of the minority group then and there agreed and so instructed their attorney that any sale of their stock must be made through him alone and only as a block; that if they could neither sell their stock as a block to the majority, nor buy out the majority, said attorney was authorized to sell their stock elsewhere, but even then only as a block; furthermore, that in any event none of the minority would dispose of his stock individually at any time without first informing the entire minority group of his intention so to do. Thereupon said attorney prepared the nec-

essary notices of intention to sell, fixing the sale price at $50 a share. In so doing he prepared individual notices for each member of the minority group to sign and send to each member of the majority group, the salutation of the notices being to "all parties" to the voting trust agreement and to "you and each of you"; and on May 15 or 16, 1934, said attorney sent said notices by registered mail to every member of the majority group. In other words, there were no notices interchanged among the members of the minority group; consequently the notice signed by the Gradys was not sent to or received by any of the plaintiffs, nor did the Gradys receive any of the notices sent by plaintiffs. The ten-day option period expired without any purchase being made by any of the majority group; but fourteen or fifteen months afterwards and during the month of July, 1935, Grady, acting for himself and his wife, without intimating to any of the other members of the minority group or their attorney his intention so to do, sold all of his stock for $57.50 a share to a group of purchasers consisting of the members of the majority group and several outsiders, all of whom are made defendants herein. The sale was conducted by a broker whose commissions were paid by defendants. Later during July, the month of the sale, Grady resigned as a voting trustee, and a member of the majority group took his place; and on or about July 22, 1935, the majority group met and divided the Grady stock among themselves and the other defendants, none of the plaintiffs being included in such division. The defendant voting trustees then ordered Corda, the registrar, a member of the minority group, to cancel the Grady stock and issue new certificates to the defendants, which he refused to do; whereupon the defendant voting trustees ousted Corda from his position and appointed in his place their attorney, George H. Harlan, who cancelled the Grady stock and issued new certificates to the defendants in the amounts agreed upon. Included in the distribution were the several persons who were not parties to the voting trust agreement, including attorney Harlan, and Thomas Foster, who had been appointed general manager of the company by the defendant voting trustees. Meanwhile Corda informed plaintiffs of the sale, and on August 10, 1935, plaintiffs served on defendants a notice of protest and a demand for their share of the stock; but the demand was refused.

8

The evidence shows that for some time preceding and at the time of the Grady sale four of the seven voting trustees and directors represented the majority group, and the trial court found that defendants induced Grady to sell by refusing as the majority of the board of directors to declare any dividends, and by refusing as a majority of the voting trustees controlling the voting rights of some four thousand of the 4125 shares outstanding, to force the directors to declare a dividend, thus sterilizing Grady's investment and forcing him to sell to realize thereon. The court further found that at no time did Grady give any notice, either in writing or otherwise, to plaintiffs or to any of them that he intended to sell any of his stock or beneficial interests; that said defendants knew that he had given no such notice to plaintiffs, and that nevertheless they prevailed upon and induced him to sell to them, and that plaintiffs did not learn of Grady's intention to sell individually to the defendants until after he had obligated himself so to do.

The construction placed by the trial court on the sixth clause of the voting trust agreement is embodied in paragraph XXV of its findings, and is as follows: ". . . if an owner of voting trust certificates issued under the voting trust agreement gives to the others notice of intention to sell his stock and the parties notified do not exercise their first right to buy within ten days thereafter, the owner is permitted to dispose of his stock elsewhere, but is permitted to do so only for a reasonable period of time, and that if he does not sell his voting trust certificates to others within such a reasonable period of time, the said voting trust certificates again are subject to all the provisions of the voting trust agreement and Paragraph Sixth thereof, the preference rights and equities of all other parties to the said voting trust agreement again attach, and it again becomes necessary for the owner of voting trust certificates before selling them to give to the other parties to said agreement notice of intention to sell, giving to them for a period of ten days thereafter a further first right and option to purchase said voting trust certificates." And in giving application to such construction the trial court found that the lapse of approximately fourteen months from the expiration of the option in May, 1934, to the date of the sale of the Grady stock in July, 1935, was more than a reasonable time; and that the notices of intention to sell, issued in May, 1934, were abandoned by all parties concerned in the year 1934. As shown

by the findings, one of the main reasons for holding that the period mentioned was more than a reasonable time was that during said period "the condition of Marin Dairymen's Milk Company, Ltd., and the value of its stock and of the voting trust certificates had substantially, utterly and completely changed."

It is a well established principle of law that when the construction given an instrument by a trial court appears to be reasonable and consistent with the intent of the parties making it, courts of appellate jurisdiction will not substitute another interpretation, even though it seems equally tenable. (*Estate of Bourn*, 25 Cal. App. (2d) 590 [78 Pac. (2d) 193]; *Adams* v. *Petroleum Midway Co., Ltd.*, 205 Cal. 221 [270 Pac. 668]; *Kautz v. Zurich Gen. A. & L. Ins. Co.*, 212 Cal. 576 [300 Pac. 34]; *Estate of Boyd*, 24 Cal. App. (2d) 287 [74 Pac. (2d) 1049]; *Estate of Burnett*, 42 Cal. App. (2d) 427 [109 Pac. (2d) 26]; *Coviello* v. *Moco Fruit Co., Inc.*, 42 Cal. App. (2d) 637 [109 Pac. (2d) 765].) And after considering all parts of the voting trust agreement in the light of each other and the circumstances under which the agreement was entered into, we are convinced that the trial court's construction of the sixth clause of said agreement is not only reasonable, but entirely consistent with the intent of the parties thereto; furthermore, that the findings of fact made in connection therewith and on the other controlling issues find ample evidentiary support. With respect to the changes that took place in the conditions of said company and the value of its stock during the fourteen months which elapsed between the expiration of the option and the sale of the stock, the record discloses these facts: In May, 1934, the company had a cash balance of $73,610, but by July, 1935, this had more than doubled to $156,777. In May, 1934, its assets were $276,453, but by July, 1935, they had increased by nearly $100,000 to $370,166. Meanwhile its liabilities had decreased from $95,937 to $92,579. In May, 1934, it had a surplus of $98,016, but by July, 1935, this had increased by roughly 153% to $171,448. And all this happened with a capital of only $82,500, or 4125 shares. In May of 1934 the surplus behind each share of stock was about $23. In July, 1935, it had increased to over $41.50 or nearly double. The earning power of the company had likewise increased tremendously. In the five months preceding May 31, 1934, the company's net profits averaged $4,000 per month. For the first seven months of

1935 up to July 31, 1935, the net profit was $166,345.17 or an average monthly net profit of nearly $9,500 or an increase of nearly 240%. Thus in the first seven months of 1935 the company was netting a profit averaging $27.60 per year per share of stock of a par value of $20.

Defendants contend that the notice of intention to sell executed by the Gradys permanently "freed" their stock from the terms of the voting trust agreement; and that therefore the Gradys were entitled to sell and the defendants entitled to buy the Grady stock in July, 1935, regardless of the lapse of approximately fifteen months after the giving of said notice. But according to the voting trust agreement, stock covered by voting trust certificates issued pursuant thereto is always subject to its provisions, even though sold after the expiration of the option period to a person not a party to the agreement. To this end the sixth clause of the agreement provides in effect that in the event the option to buy is not exercised by a party to the agreement, the certificate holder may do one of two things: he "may *hold* such certificates . . . *subject to this agreement, or* sell said certificates . . . to any person whatsoever" (italics ours); and the eleventh clause provides that "Any person accepting a trust certificate hereunder, whether through transfer or otherwise, shall become a party to this instrument, bound by all of the terms, covenants and conditions hereof." In other words, fairly construed, the above provisions mean that after the expiration of the option period the certificates remain open for sale to any person, but, as held by the trial court, for only a reasonable time; and if not sold within a reasonable time, then, as provided by the sixth clause, the owner of the certificates holds the same subject to said agreement; or if after the expiration of the option period and within a reasonable time the stock is disposed of at open sale, then under the eleventh clause the purchaser holds the certificate subject to the terms of said agreement. In either event, therefore, certificates issued pursuant to such agreement are not, by the giving of notice of intention to sell, permanently freed or freed at all from the operation of the restrictive clauses of the voting trust agreement.

The respective parties have devoted considerable portions of their briefs to a discussion of the effect of two additional findings upon which plaintiffs rely as further supporting the trial court's decree. One relates to the failure of Grady to

deliver to any of the plaintiffs a copy of the May, 1934, notice of intention to sell; and the other involves the question of the violation by the defendant voting trustees of a fiduciary relationship between them and plaintiffs created by the execution of the voting trust agreement. As to the latter, the trial court found ". . . that the voting trustees appointed pursuant to said voting trust agreement occupied a fiduciary position as to all parties to said voting trust agreement, including the plaintiffs, and that the voting trustees, agreed to recognize the rights of plaintiffs pursuant to the agreement and to refrain from doing anything in contravention of any rights of the plaintiffs"; and that said defendant voting trustees discriminated between the parties to said agreement by acquiring the Grady stock for themselves and the other defendants to the exclusion of the plaintiffs for the purpose of making a profit for themselves and to retain and consolidate the control possessed by them over said company, thereby violating their fiduciary obligations to plaintiffs as well as the provisions of paragraph sixth of the voting trust agreement. While it is true, of course, that under well settled rules all findings must be taken at their full value in support of a trial court's judgment, it is quite unnecessary to a disposal of the present appeal to inquire into or determine whether either of the foregoing findings standing alone would be legally sufficient to support the decree for the reason that in our opinion the decree is clearly sustainable as above indicated, both factually and legally, upon the first ground hereinabove mentioned.

On the last day of the trial defendants were permitted by the trial court to file an amendment to their answer whereby they sought to invoke the benefit of the doctrine of estoppel. The additional defense so pleaded is founded on subdivision 3 of section 1962 of the Code of Civil Procedure which provides: "Whenever a party has, by his own declaration, act, or omission, intentionally and deliberately led another to believe a particular thing true, and to act upon such belief, he cannot, in any litigation arising out of such declaration, act, or omission, be permitted to falsify it." The contention defendants make in this behalf is based upon the claim that plaintiffs themselves considered that by the giving of the notice of intended sale in May, 1934, the Grady stock was free of the terms of the voting trust agreement; that plaintiffs "knew that defendants would believe" that the no-

tices given by Grady and the plaintiffs were in compliance with paragraph sixth of said agreement, and that defendants would act on that assumption; that defendants acted in reliance on the conduct of the plaintiffs and Grady which, so defendants assert, was designed to make defendants believe that upon the giving of the notices of intention to sell, the stock owned by Grady and plaintiffs was free; that therefore plaintiffs were estopped afterwards from challenging the validity of the sale. However, the trial court made specific findings against the claims of the defendants as to the acts and conduct of the parties. Some of the findings on this issue have already been set forth; and it will suffice to say that those findings and all others relating to this issue are adequately supported by the evidence.

Nor is there any merit in defendants' claim of laches. The evidence adduced in behalf of plaintiffs shows that in accordance with the oral agreement made by the minority group in Attorney Harrison's office in May, 1934, plaintiffs believed that Grady would not at any time thereafter sell the Grady stock individually without giving plaintiffs previous notice of his intention so to do; that in August, 1935, immediately upon learning that Grady had obligated himself to sell the Grady stock to defendants, plaintiffs sent written notice to defendants protesting against the consummation of the sale and stating that they were ready then and there to take their proportion of the stock and pay their share therefor. However, despite the written protest and offer, defendants proceeded to consummate the purchase and divided the Grady stock among themselves and to the exclusion of plaintiffs in the manner already stated. True, the complaint herein was filed November 6, 1936, but during the interim negotiations were carried on for a settlement of all controversies, and up to the time the complaint was filed, the defendants were still the owners of the Grady stock. On this issue the trial court found that the situation of the defendants had not been changed materially or otherwise by reason of the fact that plaintiffs did not file their suit at an earlier date. As held in the following cases, the question of the existence of laches is one to be determined primarily by, and must be left largely to, the trial court; and reviewing courts will not interfere with the exercise of the trial court's decision in the matter unless it appears that manifest injustice has been done or its decision cannot reasonably be held to find support in the

evidence. (*Akers* v. *Hufford,* 128 Cal. App. 146 [16 Pac. (2d) 802]; *McMahon* v. *Grimes,* 206 Cal. 526 [275 Pac. 440].)

In the present case it does not so appear, nor can it be reasonably so held.

Likewise without merit is defendants' contention that plaintiffs should have sought recourse against the Gradys rather than these defendants. The suit is in effect one to enforce the terms of the voting trust agreement, and for the recovery of plaintiffs' proportion of the stock purchased and sold in violation thereof, and it is apparent that the Gradys could not have complied with the relief sought or granted because they had parted with their stock; and even though the law may have afforded plaintiffs a remedy against the Gradys by way of an action for damages, such was not their exclusive remedy. They were entitled also to enforce their rights under the voting trust agreement through the medium of a suit in equity.

The final contention of defendants requiring special notice is that at best plaintiffs' proportion of the Grady stock was 140 shares; whereas they were awarded 207.22 shares. It appears that this criticism is made for the first time on appeal. The mode of calculation adopted by the trial court, stated briefly, was this: since 463 of the total 4000 shares were divided, and since 951 shares thereof held by the parties to the voting trust agreement did not elect to participate in the division of the Grady stock, the number participating was 4000 minus 463, minus a further 951, or 2586 shares. Plaintiffs owned 1156 shares, constituting 44.7% of the 2586 shares, and that percentage of the Grady 463 shares is 206.96 plus shares. As will be noted, the trial court fixed plaintiffs' proportion at 207.22, but the discrepancy arises from the fact that the decree necessarily calculated the interest of each of the seven plaintiffs individually and did not carry the calculations to an infinite number of decimal places. Defendants seek to determine the ratio as of the date before the sale of the Grady stock, and in doing so they fail to deduct the Grady stock from the total of 4000 shares. But if the Grady stock is not eliminated, it would leave a percentage to which neither plaintiffs nor defendants would be entitled on the basis of proportional ownership before the Grady sale. Furthermore, defendants fail to deduct the 951 shares belonging to the parties to the voting trust agreement who did not elect to partici-

pate in the purchase or the division of the 'Grady stock. In this regard the record shows also that all of the parties to the voting trust agreement did not take the full percentage of the Grady stock to which they would be entitled on the basis of proportional ownership, while other defendants took more; and attorney Harlan and Foster, who owned no shares, were allocated a portion of the Grady holdings. Since the agreement provided that if a stockholder failed to purchase his proportion, such stock should be offered to the other stockholders proportionately, plaintiffs were entitled to claim a part of the stock which certain of the defendants would have been entitled to receive on a proportional basis, but who in fact took less or none. It also appears that defendants have erroneously computed the total number of shares held by plaintiffs at 1191 by including therein the five shares which each held outside of the voting trust agreement. It is evident that the mode of calculation adopted by the trial court is not only fair and just, but is in conformity with the provisions of the voting trust agreement.

The remaining points presented by the appeal are either incidental to those already considered or are not controlling. Consequently discussion of those points would be of no value to the disposal of the appeal.

The judgment is affirmed.

Peters, P. J., and Ward, J., concurred.

Appellants' petition for a hearing by the Supreme Court was denied March 6, 1942. Carter, J., voted for a hearing.